**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| POMPEIAN, INC., | Case No. 1:24-cv-00766 JLT EPG |
| Plaintiff, | ORDER GRANTING IN PART APPLICATION FOR RIGHT TO ATTACH AND MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| THE MILL AT KINGS RIVER, LLC, et al., | (Docs. 102, 107, 108) |
| Defendants, | |
| And related counterclaims and third-party claims. | |

This order addresses the pending motions for the right to attach and for summary judgment cited in the caption above.  As explained in this order:

    (1)    Plaintiff Pompeian, Inc. has demonstrated that it is entitled to a writ of attachment of the assets of defendant The Mill at Kings River, LLC, but not those of defendant John Mesrobian.

    (2)    The defendants to the various crossclaims and third-party claims by The Mill and Mesrobian have demonstrated that they are entitled to summary judgment of those crossclaims and third-party claims.

    (3)    Sunrise Olive Ranch LLC has demonstrated that it is entitled to summary

1

judgment on its contract claim as a third-party plaintiff against The Mill.

(4)     Genuine disputes of material fact prevent the Court from adjudicating the parties' various other pending claims at summary judgment.

**BACKGROUND**

Although the case involves a variety of claims, counterclaims, and third-party claims against several people and companies, the parties generally fall into just two groups.  In one of these groups is John Mesrobian.  He is today the sole member of a limited liability company known as The Mill at Kings River LLC, or simply "The Mill," which processes and sells olive oil. (Doc. 114-1 at 1.)  The Mill previously had a second member, Rolland Rosenthal, but Rosenthal sold his interest in the company to Mesrobian.  (Docs. 114-1 at 1; 108-4 at 27–28.) Mesrobian and The Mill are the defendants.

The Mill is a small business.  Just one person, Mesrobian himself, handles almost all of the company's day-to-day operations. (Doc. 108-4 at 44.)  This was true even before he bought out Rosenthal.  (*See id.*)  As Mesrobian put it in his deposition, he was and is "the end of the line, the only line" (*id.*), the only person who knew enough about the business to testify in a deposition on the company's behalf, for example (*id.* at 23).  A few other people have been involved in the business over the years as well, but not many.  Most importantly, Mesrobian's son Daren, a partner at a Southern California accounting firm, has sometimes helped in the past, including in the events that led to this lawsuit. (*See, e.g.*, Doc. 108-4 at 90.)  The Mill also appears to have had a few employees over the years. (*See, e.g.*, Docs. 102-6 at 2 (showing Mesrobian forwarded olive oil test results to Shayne Light); 108-4 at 79 (showing Cheryl Willms forwarded requests to an outside accountant on Mesrobian's behalf); 114-1 at 12 (showing Willms forwarded a proposed invoice to Mesrobian); 108-4 at 29 (showing Mesrobian has had help managing The Mill's bank accounts).)

Mesrobian has attempted to make clear that he does not mix his personal funds or property with The Mill's funds and property. (Doc. 114-1 at 6.)  And there is no evidence that he has used the Mill's bank accounts for his own purposes, such as by taking personal loans from the company's assets or commingling his assets with the company's.  He has sometimes kept a few of

the company's documents at his home office, but he believes "99 percent of everything was in The Mill office." (Doc. 108-4 at 22–23.)

On the other side of the case are Dan and Michael Devico, along with several companies affiliated with them. Dan Devico describes himself in a declaration as a "principal" of two California limited liability companies: Sunrise Olive Ranch, LLC and Sunset Olive Oil, LLC. (*See* Doc. 107-4 at 2.) According to an attorney who has long represented Dan Devico and these two companies, he is the "de facto Chief Executive Officer" of both those entities and some of their affiliates. (Doc. 107-3 at 2.) Michael Devico is the general manager of Sunrise. (Doc. 107-5 at 2.) It is unclear from the current record whether Michael Devico has any relationship with Sunset or any of the other related entities. The Devicos, Sunrise, and Sunset are all third-party defendants to claims by The Mill. (*See* Doc. 15 at 8.)

Sunrise and Sunset are, like The Mill, in the olive oil business. (*See* Doc. 107-4 at 2.) Sunrise is a "limited liability [sic] that grows and processes olives, and distributes and sells olive oil." (Doc 107-5 at 2.) Along with an affiliate known as "Olives Way LLC," Sunrise owns and operates olive groves in California and bottles and distributes olive oil. (Doc. 114-1 at 19.) Sunset is a "related" company, but the Devicos do not elaborate on its operations or purposes in their declarations. (Doc. 107-4 at 2.) Mesrobian understands, for his part, that Sunset is responsible for "bottling of the product for marketing," but he saw the two companies as acting "hand in glove," without any true "separation between them." (Doc. 108-4 at 32.)

Finally, there is the plaintiff, Pompeian, Inc., which is also "in the business of producing olive oil." (Doc. 108-2 at 2.) Pompeian has several ties to the Devicos, Sunrise, and Sunset. Pompeian's Chief Financial Officer, for example, is Sunset's Chief Financial Officer (Doc. 108-5 at 2), and Dan Devico acted on Pompeian's behalf at some crucial points in this case. For example, he appears to have been responsible for negotiating and approving the multi-million-dollar olive oil transaction between Pompeian and The Mill that is the subject of Pompeian's current allegations against The Mill and Mesrobian. (*See* Docs. 10 at 5–7; 114-1 at 2, 9–16, 12). There are other places in the evidentiary record where Dan Devico has not drawn clear lines between his various roles or taken care to explain who he was speaking for. (*See, e.g.*, Doc. 114-

3

1 at 18–39.)  For example, he regularly used a Pompeian email address to do a variety of business, including forwarding invoices to Ms. Mesrobian on behalf of Sunrise (*see id.* at 26) and forwarding a nondisclosure agreement, which he signed on behalf of both Sunrise and Sunset (*see id.* at 29–32). The blurring of the lines between Pompeian, Sunrise, Sunset, and the Devicos even led Mr. Mesrobian to believe that the Devicos have a controlling interest in Pompeian, if they do not own it outright.  (*Id.* at 4.)

These two groups—John Mesrobian and The Mill on one hand and the Devicos, Sunrise, Sunset, and Pompeian on the other—began the business relationship that ultimately deteriorated into this lawsuit many years ago, in 2022.  John Mesrobian and Dan Devico started discussing the possibility of a deal or partnership in the summer of that year.  Mesrobian remembers that he and Dan Devico thought they could create a "joint venture" and "combine resources" in a way that would permit them to take advantage of the Mill's processing capacity and to expand the market for olive oil, possibly even selling a large quantity of oil to Costco.  (Doc. 114-1 at 2.)  Mesrobian remembers that they explored several possible strategies, such as the acquisition of another olive oil company, an expansion of The Mill's own business, and a $2.5 million investment that would make the Devicos or their businesses fifty-percent owners of the Mill.  (*Id.*)  Whatever form this deal might have eventually taken, Mesrobian claims that he and the Devicos reached an oral agreement to create a joint venture early on in their talks, in 2022.  (*See id.*)  As he describes it in a declaration, "The joint venture was to combine resources to expand the market for the olive oil, particularly for organic olive oil, take advantage of the processing capacity of The Mill, to take advantage of economies of scale."  (*Id.*)

According to Mesrobian, The Mill's outstanding obligations were always in the background of their discussions.  That was especially true of The Mill's debts to an entity he refers to as "Landec," which had provided financing to the Mill.  (*Id.* at 2–3.)  In the olive oil business, he explains, your expenses are always "running ahead of you." (Doc. 108-4 at 46.)  The company must buy and pay for oil before it can process and ultimately sell it.  (*See id.*)  The Mill had thus obtained financing to pay its olive growers in the past, and it would need to "clean up" these outstanding obligations before it could hope to spend more money securing new sources of

oil as part of any deal or venture with the Devicos and their companies.  (114-1 at 2–3.)  An investment from the Devicos and the businesses they represented would help to shore up The Mill's finances, freeing its resources to pay growers and expand its business.  (*Id.* at 2.)

Mesrobian claims that none of this was a secret.  (*See id.*)  He claims the Devicos understood from the beginning that The Mill had obligations to Landec and that The Mill would use at least a portion of any invested funds to pay off its obligations to its growers and to Landec.  (*See id*. at 2–3.)  Mesrobian also claims that most of his discussions and negotiations with the Devicos were oral, not in writing.  (*See id.* at 2.)  But there is a patchy trail of emails and other documents in the record.  It corroborates at least some of his claims.

In July 2022, for example, Mesrobian emailed a nondisclosure agreement to Dan Devico in preparation for a meeting at The Mill.  (*See id.* at 29, 31–32.)  They seem to have then discussed The Mill's confidential financial information, including its debts: the next week, Devico emailed back to ask whether he should send technical and financial questions to John or to his son Daren, including questions about when The Mill would need "pay back the $1.9 million to Landec."  (*Id.* at 30.) Devico seems to have been unconcerned about these debts.  He made clear in the same email that he had spoken with his "partners" and that they were "all on the same page."  (*Id.*)  He was looking forward to reviewing The Mill's financial documents and "other details" so they could start working on a potential deal.  (*Id.*)  Daren Mesrobian eventually sent Devico income statements and balance sheets from the past several years, "along with a page showing current debt balances and pro-forma capitalization."  (*See id.* at 37–38.)  Once again Devico seemed untroubled.  He said he would send the detailed data to his "partners" and expressed interest in Daren's "ideas on Tax benefits/incentives."  (*Id.* at 37.)

The trail picks up again in another email sent several weeks later, in early October 2022.  Devico described his plans for a potential deal in more concrete terms.  (*See* Doc. 114-1 at 18.)  He wrote using the first-person plural pronouns "we" and "our," included Michael Devico among his recipients, and referred to "family" businesses and partners, as if to communicate that he was speaking for both men and for the broader group of companies and their various affiliates.  First, Dan Devico explained that the family holding company would help pay for the acquisition of a

company called "O Olive," which was then a part of Landec. (*See* Docs. 114-1 at 18; 108-4 at 13.) Second, Devico confirmed that it was time "to start working on a purchase agreement" for an investment in The Mill, which would be accomplished through the same family holding company and another "partner" in Spain. (Doc. 114-1 at 18.) Third, Devico said that they had budgeted $2 million as an advance from Pompeian to the suppliers of organic extra virgin olive oil, which Pompeian would later buy from The Mill and sell under its own label. (*Id.*) He expressed interest in conventional (i.e., not organic) olive oil deals as well. (*Id.*) Fourth, he said that he and his partners wanted to take advantage of any tax benefits that might be available through another company the Mesrobians maintained in the Fresno area, Capstone Bottling, LLC. (*Id.*) And finally, he asked for more specific information about the financing. These questions left no doubt that he understood The Mill's debts and other obligations would play a role of some kind in the deal: What part of the deal would be in cash? What part would be in a note from the seller? Who was paying off the debt to Landec? (*See id.*)

A few days later, Daren Mesrobian emailed the Devicos a draft indication of interest or letter of intent related to a potential acquisition from Landec. (*See id.* at 19, 21.) Devico responded later that day with comments on a paragraph within that draft, clarifying how the acquisition would be funded. (*See id.* at 19.) The paragraph referred to "Dan and Michael Devico" as the "owners of Family business Sunrise Olive Ranch LLC, and Olives Way LLC" and said they would capitalize the "Buyer with an equity investment of $2.5 million." (*Id.*)

Email records appear to confirm as well that The Mill and the Devicos ultimately forwarded a letter of intent or indication of interest to Landec's financial advisor (*see id.* at 21), received a potentially promising response (*see id.*), and together began discussing their next steps (*see id.* at 20–21). Attorneys representing the Devicos and The Mill began hashing out amendments to the necessary operating agreements. (*See* Doc. 107-3 at 3–4, 8–9, 11–62.) Daren Mesrobian discussed a disclosure with financial advisors and attorneys. (Doc. 108-4 at 92.) Dan Devico and John Mesrobian emailed about a $2 million olive oil transaction between Pompeian and The Mill—possibly the "advance" to the "supplier" that Devico had mentioned before. (*See* Doc. 114-1 at 9–12, 18.)

6

That $2 million transaction eventually went awry.  As noted, it is the primary subject of Pompeian's legal claims against The Mill and Mesrobian in this case.  Although it is unclear whether the record includes a complete, final, and authentic copy of the purchase agreement in question, some of the basic terms are not disputed: Mesrobian prepared the original invoice and sent it to Pompeian on November 21, 2022.  (Doc. 108-2 at 2.)  The Mill agreed to provide 48,000 gallons of organic extra virgin olive oil, and Pompeian agreed to pay $1,992,000, including a $1 million "prepayment."  (*Id.*)  Pompeian paid $1 million to the Mill in early December 2022, and the Mill used that payment to reduce its obligations to its growers and to Landec.  (*See id.* at 2–3.)  Although the invoice appears to state that the remaining balance of $992,000 would come due later the same month, Pompeian did not pay the full purchase price on the due date.  No evidence shows The Mill requested payment, nor did The Mill deliver the agreed volume of oil; it sent only samples to Pompeian for testing.  (*See id.* at 2.)

The Mesrobians, the Devicos, and their advisors pressed forward with their discussions about the larger deal in the meantime.  (*See* Docs. 107-3 at 8; 108-4 at 88, 90.)  The Mill also sent oil samples to Pompeian for testing.  (Doc. 108-4 at 159.) Sunrise also sold and shipped olive oil to The Mill.  On December 23, 2022, its records show that it sold and shipped 110 gallons of 2022 harvest extra virgin olive oil to The Mill at $40 per gallon, for a total price of $4,400.  (Doc. 107-4 at 11–12.)

In early January 2023, Dan Devico emailed John Mesrobian to let him know that Pompeian had sent The Mill's olive oil samples to a lab in Italy.  (Doc. 102-6 at 2.)  According to Devico's email, the lab had found the "residue" of two pesticides in the samples.  (*Id.*)  He asked if Mesrobian had his own "Certification of Analysis" showing no contamination.  (*Id.*) "Sometimes mistakes happen in the Lab," he suggested, "or contamination can come from surrounding fields."  (*Id.*)  Mesrobian responded with copies of "the organic certifications for the mill and all our growers."  (Doc. 102-21 at 2.)  He sent "tests for pesticides [The Mill had] conducted on a lot a year ago as part of our normal process," along with more recent test on one grower's olives.  (*Id.*)  He also reassured Devico that The Mill had forwarded samples to another lab for testing as well.  (*Id.*)  He promised to "continue to review for an explanation."  (*Id.*)

7

Much later, after an investigation and testing, Mesrobian attributed the test results to "drift" from neighboring fields, likely captured in the wind, caught in the inversion layer, and ultimately deposited on olive groves that belonged to The Mill's suppliers. (Doc. 108-4 at 111–16.) The Mill's own testing was inconsistent, but confirmed that there were pesticide residues in some of its oil, though perhaps not all. (Doc. 108-4 at 116.) The test results do not appear to have ended the parties' discussions about the surrounding deal. They and their advisors continued to exchange information and hash out details. (*See, e.g.*, Docs. 107-2 at 46–49; 107-3 at 11; 108-4 at 87.) Sunrise also continued to sell and deliver olive oil to The Mill. (*See* 107-4 at 7–10.) On January 25, 2023, its records show that it shipped 5,800 gallons of oil to The Mill, with a total price of $232,000. (*Id.* at 8; *see also* Doc. 114-1 at 26–27.)

As the weeks and months ticked by, however, no deal emerged. (Docs. 107-2 at 41–45; 114-1 at 23–24, 34.) The reasons are unclear. The record does not include evidence showing whether Pompeian or any of its representatives requested repayment of the $1 million that it had paid the year before, nor the delivery of any oil.

Eventually, after about a year of negotiations, the delays and uncertainties were starting to cause problems for The Mill. (Doc. 108-4 at 84.) In August 2023, Mesrobian claimed the Devicos "suddenly dropped out of the entire process." (Doc. 114-1 at 6.) He tried to rekindle their talks without success. (*See id.* at 36.) The Mesrobians appear never to have received any persuasive explanation for why the deal fell apart. Daren Mesrobian suspected that the Devicos had wanted to move forward but that the decision was ultimately not in their hands. (*See* Doc. 107-2 at 39.) The Devicos do not explain even now why the deal fell through. Dan Devico states only vaguely that "the parties were unable to agree upon certain fundamental terms of their contemplated business relationship." (Doc. 107-4 at 4.)

By this point, almost a year had gone by since Pompeian had paid The Mill $1 million in anticipation of an olive oil shipment, and eight months or more had passed since the Italian lab had found pesticide residues in The Mill's samples. Emails and other internal documents suggest that The Mill and John Mesrobian had begun to view the $1 million as a liability. For example, Mesrobian requested that The Mill's balance sheets show the company owed $1 million to

Pompeian "for the payment on the uncertified organic olive oil that they returned." (Doc. 108-4 at 79.)

Sure enough, in October 2023, a few months after the deal fell through, attorneys representing Pompeian demanded "conforming product" on the company's behalf. (*Id.* at 68.) Pompeian and the Mill attempted to negotiate a compromise over the next few months, but without success. (*See* Doc. 108-5 at 6–9, 108-4 at 73.) Pompeian filed a complaint against The Mill in federal district court in Maryland in late December 2023. (*See* Doc. 1, Case No. 23-3494 (D. Md. Filed Dec. 22, 2023).) The court dismissed the case for lack of personal jurisdiction in June 2024, and Pompeian filed its complaint in this court soon afterward. (*See* Docs. 9, 10, Case No. 23-3494, (D. Md. Filed June 27, 2024).)

Pompeian is pursuing claims against both The Mill and John Mesrobian for breach of contract, breach of an implied contract, unjust enrichment under a quasi-contract theory, conversion, and fraud. (Doc. 10.) In response, the Mill and Mesrobian assert three counterclaims and third-party claims against Pompeian, Sunrise, Sunset, Dan Devico, and Michael Devico, for breach of fiduciary duty, fraud, and breach of a joint venture or partnership agreement. (Doc. 15.) Finally, Sunrise asserts counterclaims for breach of contract and common counts against The Mill, all based on the olive oil deliveries in December 2022 and January 2023. (Doc. 27.) Pompeian, Sunset, Sunrise, and the Devicos all move for summary judgment. (Docs. 107, 108.) Pompeian has also sought permission to attach The Mill's and John Mesrobian's assets. (Doc. 102.) Briefing on all three motions is complete, and the Court determined no hearing is necessary. (Docs. 104, 106, 113–18.)

While the motions were pending, Sunrise filed notice of an intervening opinion by the California Court of Appeal. (Doc. 119 (citing *Clarke v. Yu*, 119 Cal. App. 5th 199 (2026)).) The Mill and Mesrobian responded. (Doc. 121.) The Court has considered the cited case, but not Sunrise's belated argument based on the statute of frauds. Sunrise could and should have made that argument in its original motion. It did not. The Court begins with the summary judgment motions.

///

9

**SUMMARY JUDGMENT**

Federal Rule of Civil Procedure 56 gives district courts authority to grant summary judgment to a party who shows both "that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The court views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

As summarized above, the pending motions target several claims, counterclaims, and third-party claims. The Court begins with the claims that Mesrobian and the Mill assert in their responsive pleading (Doc. 15) because they are the broadest.

**I.      CLAIMS BY MESROBIAN AND THE MILL**

The Mill and Mesrobian first contend that they were part of a "joint venture for the olive oil business" with Pompeian, the Devicos, Sunrise, and Sunset. (Doc. 114 at 10.) "A joint venture is 'an undertaking by two or more persons jointly to carry out a single business enterprise for profit.'" *Weiner v. Fleischman*, 54 Cal. 3d 476, 482 (1991) (quoting *Nelson v. Abraham* 29 Cal. 2d 745, 749, (1947)). A written contract is not necessary to create a joint venture. A joint venture can be formed orally and can even be inferred from "the acts and declarations of the parties." *Id.* at 482–83 (quoting *Swanson v. Siem*, 124 Cal. App. 519, 524 (1932)).

It is ultimately the obligation of the person who claims that there was a joint venture to prove that claim at trial. *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1173 (9th Cir. 2022). The necessary proof includes evidence of "an agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control." *Id.* at 1173 (quoting *Connor v. Great W. Sav. & Loan Ass'n*, 69 Cal. 2d 850, 863 (1968)). California courts

have often broken these requirements into three elements: "(1) a joint interest in a common business, (2) an understanding to share profits and losses, and (3) a right of joint control." *Clarke v. Yu*, 119 Cal. App. 5th 199, 206 (2026) (quoting *County of Riverside v. Loma Linda Univ.*, 118 Cal. App. 3d 300, 313 (1981)).

Mesrobian and The Mill have not cited portions of the record that they could rely on at trial to show that they were part of an enforceable joint venture agreement.  They have not produced any written joint venture agreements.  They have not identified any particular oral conversation in which the parties agreed to participate in a common business effort.  They have not cited conduct that could permit a factfinder to infer that the parties were sharing control over any particular enterprise, along with any profits or losses that might follow.  At most, a jury could conclude from the parties' negotiations that they were discussing the terms of a future venture or some other new business but that crucial parts of their plans were never finalized.  This does not suffice.  Neither initial enthusiasm about a potential deal nor an agreement to pursue an agreement is enough to create an enforceable joint venture.  *See, e.g.*, *Brezoczky v. Domtar Corp.*, No. 16-04995, 2017 WL 6017854, at *4 (N.D. Cal. Dec. 5, 2017), *aff'd*, 770 F. App'x 353 (9th Cir. 2019); *Goodworth Holdings Inc. v. Suh*, 239 F. Supp. 2d 947, 956 (N.D. Cal. 2002), *aff'd*, 99 F. App'x 806 (9th Cir. 2004).

It might be possible to describe the parties' long-running negotiations as a "joint venture" in a colloquial sense.  Mesrobian and The Mill emphasize, for example, how they made financial sacrifices in pursuit of a deal, received advances from their potential partners, and did other things they would not ordinarily have done, such as agreeing to share confidential financial information, all in pursuit of a mutually beneficial business deal.  (*See, e.g.*, Doc. 114 at 10–11.)  But to obtain a favorable judgment in a lawsuit based on a joint venture claim, a litigant must offer more specific and targeted proof than this.  *See, e.g.*, *Calamco v. J.R. Simplot Co.*, No. 21-01201, 2025 WL 2050699, at *14–15 (E.D. Cal. July 22, 2025) (rejecting a joint venture theory that rested on evidence about a shared business and longstanding, close commercial contacts, but not shared profits and losses); *City Sols., Inc. v. Clear Channel Commc'ns, Inc.*, 201 F. Supp. 2d 1048, 1050 (N.D. Cal. 2002) (finding no fiduciary relationship, i.e., no joint venture or partnership, based

merely on the fact that "the parties reposed trust and confidence in each other" (quoting *Worldvision Enters., Inc. v. Am. Broadcasting Cos., Inc.*, 142 Cal. App. 3d 589, 595 (1983))).

Because Mesrobian and The Mill cannot show that the parties created a joint venture, they cannot show any opposing party breached a joint venture agreement, nor that any opposing party violated any resulting fiduciary duty. *See, e.g.*, *Calamco*, 2025 WL 2050699, at *14–15 (granting summary judgment of a claim for breach of fiduciary duty based on the proponent's failure to cite evidence that could establish a joint-venture relationship). Their joint venture and fiduciary duty claims are not viable.

Mesrobian's and The Mill's remaining claim is a common law claim for fraud. (*See* Doc. 15 at 17–18.) To prove this claim, they must show, among other things, that each opposing party made a false or misleading statement. *See, e.g.*, *Lazar v. Superior Court*, 17 Cal. 4th 631, 638 (1996). Mesrobian and The Mill alleged in their pleadings that Pompeian, Sunrise, Sunset, and the Devicos falsely or misleadingly stated that the joint venture was a "done deal" and created "false narrative" using a secret purchase agreement. (Doc. 15 at 17.) But they do not mention these allegations in their oppositions to the pending motions, and they have not cited evidence that could prove they are true.

For these reasons, the pending motions for summary judgment are granted in part with respect to the claims by Mesrobian and The Mill against Pompeian, Sunrise, Sunset, and the Devicos. Mesrobian and The Mill have not identified any genuine dispute of material fact, and their opposing parties have demonstrated that Mesrobian and The Mill cannot prevail in their affirmative claims at trial. The Court turns next to the claims by Pompeian.

II.   **CLAIMS BY POMPEIAN**

A.   **Alter Ego Liability**

Pompeian asserts claims against The Mill and Mesrobian personally. It contends he is personally liable for The Mill's obligations because The Mills is merely his corporate "alter ego." (Doc. 108-1 at 13–15.)

The "alter ego" or "veil piercing" doctrine permits a court to disregard a corporate entity, such as a limited liability company, and to hold the individual owners or members liable for the

12

company's obligations, but only in very limited circumstances. *Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 300 (1985); *JPV I L.P. v. Koetting*, 88 Cal. App. 5th 172, 189 (2023). It is "an extreme remedy, sparingly used." *JPV*, 88 Cal. App. 5th at 189 (quoting *Highland Springs Conference & Training Ctr. v. City of Banning*, 244 Cal. App. 4th 267, 281 (2016)). The person who relies on a theory of alter ego liability must ultimately prove (1) there is such "a unity of interest and ownership" that the company and the individual cannot truly be thought of as separate entities and (2) the result of maintaining the separate corporate identity would be inequitable. *Id.*

This is not a simple "litmus test." *Mesler*, 39 Cal. 3d at 300. It is "normally a question of fact." *Zoran Corp. v. Chen*, 185 Cal. App. 4th 799, 811 (2010). And there are many facts to consider, such as any commingling of funds, diversions of assets, the failure to maintain minutes or other records, failures to observe corporate formalities, inadequate assets, shared addresses, and even the individual's assertion that he is personally liable, "and the use of the corporation as a mere shell, instrumentality or conduit for the business of an individual." *JPV*, 88 Cal. App. 5th at 194–95 (quoting *Misik v. D'Arco*, 197 Cal. App. 4th 1065, 1073 (2011)).

For the first part of the test, Pompeian argues The Mill was Mesrobian's alter ego because (1) he controls The Mill, (2) he is responsible for almost all of The Mill's day-to-day operations, (3) The Mill's statement of information is overdue with the Secretary of State, (4) Mesrobian kept a small portion of The Mill's documents in his home office, (5) Mesrobian and The Mill have employed the same attorney, and (6) The Mill has very few liquid assets, i.e., is inadequately capitalized. (Doc. 108-1 at 14–15.) At summary judgment, the Court must take the evidence in the light most favorable to Mesrobian. In that light, the evidence does not show beyond dispute that The Mill is or was his alter ego. Mesrobian was not The Mill's only member at the time of the disputed transaction. No evidence suggests he mixed his assets with The Mill's assets or used The Mill's assets for his own purposes. No evidence shows he claimed to be personally liable for the Mill's debts, and he would testify at trial that The Mill maintained its own accounts, its own books, and its own business. (Doc. 114-1 at 6.) It would be reasonable to conclude from this record that the Mill was simply a very small but legitimately separate entity.

13

For the second part of the test, Pompeian asserts that "it would be unjust to treat The Mill and Mr. Mesrobian as separate entities," but it does not explain why. (Doc. 108-1 at 14.) Instead it reiterates its arguments that Mesrobian controls The Mill and testified on its behalf. (*See id.*) A litigant who asks a court to disregard the corporate form must show that the corporate entity was "used to perpetuate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000). "The alter ego doctrine does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form." *Id.* at 539. Pompeian has not cited evidence that demonstrates beyond any genuine dispute that Mesrobian operated The Mill with a "fraudulent or deceptive intent." *Id.*

In sum, it would be reasonable to conclude from the current record that The Mill was separate from Mesrobian, a small company, but a truly separate entity nonetheless, and one that has sometimes had very few liquid assets, not because Mesrobian stripped it of funding or intended to use it for malevolent purposes, but because of the nature of the olive oil market itself. In addition, as summarized above, the record also includes evidence that could prove that it was no secret that The Mill had obligations to its creditors and would use at least some of the money it received from Pompeian or the Devicos to satisfy those obligations. Dan Devico even wrote in an email that Pompeian had "budgeted" $2 million specifically to pay The Mill's olive oil suppliers. (*See* Doc. 114-1 at 18.) When that statement is taken in the light most favorable to Mesrobian and The Mill, it undermines Pompeian's claims of deception and injustice. The Court will not disregard the Mill's separate identity for purposes of Pompeian's summary judgment motion.

**B.    Contract**

Pompeian's first affirmative claim is for breach of a written contract. (Doc. 10 at 5.) It alleges The Mill breached the written purchase agreement to sell several thousand gallons of organic extra virgin olive oil for about $2 million by accepting a $1 million "prepayment" without delivering any olive oil that met its specifications. (*See id.*) To prove this claim at trial, Pompeian would need to show there was a contract, that it performed its obligations under the

contract (or is excused from performing), that The Mill breached the contract, and that the breach caused damages. *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

The record includes a few documents related to the transaction. One is attached as an exhibit to a declaration by John Mesrobian, which he filed in conjunction with his opposition to the pending motions for summary judgment. (Docs. 114-1 at 9–10; *see also* Doc. 115-1 at 9.) The first page, titled "invoice," refers to 48,000 gallons of "California Organic Olive Oil 2012 Harvest" at $41.50 per gallon, for a total price of $1,992,000.00. (Doc. 114-1 at 9.) About half of the total purchase price ($1 million exactly) would be "due and payable" within five days (November 23, 2022), and the balance ($992,000.00) would be due a few weeks later, on December 10, 2022. (*Id.*) The next page, titled "Purchase Agreement," quotes a very similar— but not identical—total price ($1,992,000.162) and appears to describe several documents that must accompany the shipment, including "Certificates of Origin, Full Analysis & Pesticides within US limits." (*Id.* at 10.) It also includes the lines "Samples for approval to send to Taster & Pompeian" and "At loading: Pre-shipment sample to send to Pompeian." (*Id.*) The third page then lists several terms and conditions, including some related to Pompeian's right to reject any defective goods:

> 5. All shipments are subject to a quality inspection. Pompeian reserves the right to reject any goods as damaged or defective within five (5) days of receipt. Pompeian shall be accorded full credit for any such rejected goods. In addition, Pompeian reserves the right to reject for full credit any item found to be defective upon use on our production lines where the problem is determined to be a result of poor manufacturing by the Supplier and not as a result of misuse or mishandling by Pompeian. Any manufacturer defects that result in downtime on Pompeian's productions lines are subject to fines of one thousand dollars (USA 1,000) per hour of lost production time and/or two hundred fifty dollars (USD 250) per hour of rework time.

(*Id.* at 11.) The same exhibit excludes a brief email exchange between John Mesrobian and Dan Devico. (*Id.* at 12.) Mesrobian forwarded an email with the subject line "Pompeian invoice," asking, "Is this ok?" (*Id.*) Devico responded by requesting that he "specify California Organic Extra Virgin Olive Oil." (*Id.*) The exhibit includes no response from Mesrobian. (*See id.*)

A different version of these documents accompanies Pompeian's motion for the right to

15

attach The Mill's and John Mesrobian's assets.  (*See* Docs. 102-2, 102-3, 102-4.)  Pompeian split the documents into three exhibits.  In one exhibit, it reproduced just the single-page November 18, 2022 invoice for "California Organic Olive Oil 2022 Harvest" with a total purchase price of $1,992,000.00.  (Doc. 102-3 at 2.)  Pompeian did not attach the "Purchase Agreement" or "Terms & Conditions" pages that accompanied the version of the invoice that Mesrobian attached to his declaration.  Second, in a separate exhibit, Pompeian attached a more complete version of the email exchange quoted above.  (*See* Doc. 102-4 at 2.)  After Dan Devico asked Mesrobian to specify "Extra Virgin" olive oil, Mesrobian responded, "I should've done that" and promised to "forward amended [sic] shortly."  (*Id.*)  The third exhibit is a single-page invoice, apparently the corrected invoice, referring to "California Organic Extra Virgin Olive Oil 2022 Harvest."  (Doc. 102-2 at 2.)  Aside from that change, it appears to be the same as the other version of the invoice.  Again, however, Pompeian did not attach the "Purchase Agreement" or Terms & Conditions" pages to the single "Invoice" page.

In addition to the $2 million invoice, Mesrobian attached an invoice for a different and smaller total amount, i.e., $1,329,557.00, as another exhibit to his declaration.  (*See* Doc. 114-1 at 14.)  This smaller invoice refers to "California Extra Virgin Olive Oil 2022 Harvest," states that a wire transfer of $1 million was paid on December 2, 2021, and includes the word "revised" in the lower left corner.  (*Id.*)  It then provides that the balance of $329,557 was due "a.s.a.p."  (*Id.*)  The smaller invoice appears otherwise to be identical to the larger invoice.  Mesrobian does not explain the discrepancy in prices or why a "revised" invoice was prepared, but he claims that Dan Devico requested and set the terms of both documents.  (*Id.* at 2–3.)  "The idea," Mesrobian claims, "was to get funds to The Mill from Pompeian in order to have funds to pay the growers of the organic olives."  (*Id.*)

Yet another version of the same documents is part of an exhibit to Pompeian's summary judgment motion.  (*See* Doc. 108-4 at 68–71.)  This version—attached to a letter sent almost a year after the invoice date—excludes the "invoice" page but includes the "Purchase Agreement" and "Terms & Conditions" pages.  (*See id.*)  Pompeian's attorney states in a declaration that Pompeian prepared the "purchase agreement to mirror the transaction terms reflected in the

Invoice" and "intended to send that purchase agreement to The Mill." (Doc. 108-5 at 2.) For reasons he does not explain, however, "The Mill did not receive that document" for about a year. (*Id.*)

To summarize, the record includes several different versions of the disputed purchase agreement. Some versions refer to a total price of about $2 million, but one refers to a lower total price. Some versions include only an invoice. One includes only a purchase agreement and a list of terms and conditions. Another includes all three, but it is unclear whether that version was only a draft. It appears to be undisputed, in fact, that Mesrobian and The Mill did not have the full collection of relevant documents—invoice, purchase agreement, and terms and conditions— until several months after the planned sale was originally intended to be completed.

The Court must assume for purposes of Pompeian's pending motion that a factfinder would resolve these uncertainties and ambiguities in favor of Mesrobian and The Mill. And so, because there appears to be no consensus about which documents are controlling, it would likely be reasonable for a factfinder to decide on this record that there is no final, complete, authentic written contract memorializing the terms of the disputed sale.

Even setting these uncertainties aside, however, and considering all of the various documents together as a single contract, Pompeian has another obstacle to overcome. It is unclear what agreement the parties reached, if any, about what they would do if The Mill's oil did not meet Pompeian's expectations, let alone what those expectations were exactly.

Starting with the invoice page, it leaves the most basic and perhaps the most important word of all undefined: it does not include any description of what qualifies as "organic." It does not say what testing would suffice to show the oil was "organic," what test results would show it was not "organic," or what obligations or rights any party would have in the event of any particular test results. Pompeian has not offered any evidence about standard industry practices or commonly understood terminology to fill in these gaps, either. Nor has it cited any relevant statutes, regulations, expert opinions, or testimony that might provide a clear answer.

The "purchase agreement" page is also ambiguous. Although it refers briefly to pesticides, analysis, and samples, Pompeian has not offered any testimony or other evidence to

17

shed light on what these references imply about The Mill's obligations, timelines, test results, and the $1 million payment.  By no means does the written purchase agreement establish beyond dispute that a particular test result would relieve Pompeian of its obligations to pay anything, nor impose an obligation on The Mill to immediately return the $1 million payment.

The terms and conditions page is similarly unhelpful.  If anything, when that page is taken in the light most favorable to the Mill, it undermines Pompeian's position.  As quoted above, Pompeian reserved for itself the right to "reject" any "defective" goods, but only "within five (5) days of receipt."  (*E.g.*, Doc. 108-4 at 71.)  The record does not show beyond dispute that Pompeian rejected The Mill's samples within five days of receipt, nor that Pompeian and The Mill agreed to alter that deadline.  The terms and conditions are also silent when it comes to prepayments, partial payments, and testing.

For these reasons, it is reasonable to conclude that The Mill could demonstrate at trial that the relevant documents are ambiguous and that the parties behaved as though The Mill did not have any obligation to repay the $1 million before any conflict arose.  *See, e.g.*, *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949, 964 (E.D. Cal. 2016) (summarizing and applying California's rules for interpretation of ambiguous contracts, including the rules for admission of extrinsic evidence about the parties' course of performance).  Pompeian has not demonstrated that there is no genuine dispute of material fact about the terms of the written purchase agreement, nor that it satisfied its obligations under the written agreement, that it is excused from those obligations, and that The Mill breached the terms of the agreement.  Pompeian's motion is denied with respect to claim one.

Beyond the written purchase agreement, Pompeian pursues an alternative claim for breach of an implied contract.  (*See* Doc. 10 at 6–7.)  "A cause of action for breach of implied contract has the same elements as does a cause of action for breach of contract, except that the promise is not expressed in words but is implied from the promisor's conduct."  *Gomez v. Lincare, Inc.*, 173 Cal. App. 4th 508, 525 (2009) (quoting *Yari v. Producers Guild of Am., Inc.* 161 Cal.App.4th 172, 182 (2008)).  Again, when the evidence is taken in the light most favorable to Mesrobian and The Mill, it does not support Pompeian's position.  Pompeian did not demand repayment after

18

tests detected pesticides in the samples.  Instead, Pompeian said nothing for several months while the Mesrobians and the Devicos continued to discuss a possible investment or another business relationship.  Pompeian did not bring up the $1 million payment until those discussions broke down.  Even then it demanded repayment based on the written purchase agreement, not an agreement implied from some previous conduct, common practice, or similar activity.  This conduct is inconsistent with a binding agreement to deliver promptly or repay.  The record also includes evidence corroborating Mesrobian's assertion that the $1 million payment was actually part of an ongoing joint effort to secure a reliable source of olive oil from The Mill's suppliers, as summarized in the background section above.  If that is true, then it is unclear what obligations the Mill would have to repay Pompeian, when, and on what terms.  For these reasons, the parties' conduct does not show beyond dispute that The Mill was obligated to return the $1 million payment as a matter of law under the rules of implied contracts.  The motion for summary judgment of claim two is denied.

Finally, as a third alternative, Pompeian asserts an equitable claim for unjust enrichment.  (Doc. 10 at 7–8.)  Federal courts cannot adjudicate equitable claims unless they have "equitable jurisdiction." *Ruiz v. Bradford Exch., Ltd.*, 153 F.4th 907, 910 (9th Cir. 2025), *cert. denied*, No. 25-1125, 2026 WL 1127205 (U.S. Apr. 27, 2026).  "'[A] plain, adequate, and complete remedy at law must be wanting' for a federal court to exercise its equity powers, even in cases were 'a State may authorize its courts to give equitable relief unhampered' by a similar restriction." *Id.* (quoting *Guaranty Trust Co. of N.Y.C. v. York*, 326 U.S. 99, 105–06 (1945)).  Here, Pompeian would have a legal remedy—for contract damages—if The Mill breached a written or implied contract, as Pompeian alleges it did.  That is the subject of a genuine dispute of material fact, as explained above.  Pompeian's equitable claim must therefore await a resolution at trial as well.  The motion for summary judgment of claim three is denied.

### C.    Conversion

Pompeian's fourth claim is for conversion.  (Doc. 10 at 8–9.)  "Conversion is the wrongful exercise of dominion over the property of another.  The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion

by a wrongful act or disposition of property rights; and (3) damages." *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015) (quoting *Welco Electronics, Inc. v. Mora*, 223 Cal. App. 4th 202, 208 (2014)).

"Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment." *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1491 (2006); *see also, e.g.*, *Lee*, 61 Cal. 4th at 1240; *Fischer v. Machado*, 50 Cal. App. 4th 1069, 1074 (1996). Viable claims for conversion of money "typically involve those who have misappropriated, commingled, or misapplied specific funds held for the benefit of others." *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 396 (2007). The State's appellate courts have refused to permit litigants to pursue conversion claims based on money that changes hands in more transactional or commercial relationships. *See, e.g.*, *McKell*, 142 Cal. App. 4th at 1464, 1491–92 (rejecting conversion claim based on allegations that the defendants overcharged the plaintiffs "for underwriting, tax services, and wire transfer fees in conjunction with home loans"); *Vu v. Cal. Com. Club, Inc.*, 58 Cal. App. 4th 229, 231 (1997) (rejecting conversion claim based on gambling losses); *Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 452 (1997) (collecting authority to show that "a mere contractual right of payment, without more, will not suffice.").

Pompeian does not cite any cases in which California's appellate courts have held that a plaintiff in a similar situation could pursue a viable conversion claim. The only potentially similar case it cites is a decision by a state trial court. *See* Doc. 108-1 at 16 (citing *Caces v. Ghawi*, No. 22STCV35515, 2023 Cal. Super. LEXIS 65475, \*7 (Super. Ct. Cal., L.A. Cty. Sept. 14, 2023)).) State trial court decisions are not binding. They can be persuasive at most. *Stokes v. CitiMortgage, Inc.*, No. 14-00278, 2015 WL 709201, at \*7 (C.D. Cal. Jan. 16, 2015). The trial court's decision in *Caces* is not persuasive. It does not mention or discuss the principles summarized above.

More fundamentally, the arguments Pompeian makes in support of its conversion claim are also essentially the same as those it makes in support of its contract claims. (*See* Doc. 108-1 at 16.) Pompeian does not explain why it would be entitled to $1 million in damages for

conversion if it is not entitled to damages for breach of contract or unjust enrichment. In short, Pompeian has not demonstrated that there are no genuine disputes of material fact, nor that it is entitled to judgment on its conversion claim as a matter of law.

### D.      Fraud

Pompeian's final claim is for fraud. (Doc. 10 at 9–10.) To prove this claim, it must show, among other things, that Mesrobian or The Mill made a false or misleading statement. *See, e.g.*, *Lazar*, 17 Cal. 4th at 638. Pompeian contends that Mesrobian and The Mill "concealed their true purpose for the Invoice." (Doc. 108-1 at 18.) That is, Pompeian argues Mesrobian and The Mill never intended to deliver any olive oil, even though they said or implied that they would. (*See id.* (arguing The Mill "received the $1 million payment not as a prepayment for Product but with the understanding that it was to help The Mill deal with a now-past-due note to Landec Corporation, as well as to ensure timely payment to certain of The Mill's organic olive growers." (citations, alterations, and quotation marks omitted)).)

The record does not support this theory of falsehood beyond dispute. For example, Mesrobian and The Mill shipped samples of what they thought was organic, extra virgin olive oil to Pompeian for testing, which implies in turn that Mesrobian and The Mill intended to ship more of the same oil if it passed Pompeian's tests. (*See* Doc. 108-2 at 2–3.) It is unclear why they would have done this if they had never intended to ship any olive oil to begin with. The motion for summary judgment of Pompeian's fraud claim is denied.

## III.     CLAIMS BY SUNRISE

Sunrise seeks summary judgment first on its claim that The Mill breached two olive oil purchase contracts. To prove this claim at trial, Sunrise would need to show there was a contract, that it performed its obligations under the contract (or is excused from performing), that The Mill breached the contract, and that the breach caused damages. *Oasis W. Realty*, 51 Cal. 4th at 821. Sunrise cites the two written purchase orders from December 2022 and one from January 2023. (*See* Docs. 107-4 at 7–12.) Those orders show The Mill took delivery of two shipments of olive oil after agreeing to pay $236,400 for the delivered quantities. The Mill does not dispute Sunrise's assertion The Mill "issued the purchase orders and those orders governed the parties'

transaction." (Doc. 107 at 13.)  Nor does The Mill cite evidence (or even argue) that it has ever paid for the oil that Sunrise delivered; Sunrise asserts without contradiction that it has received no payment at all.  (*See* Docs. 107 at 14; 107-4 at 2–3.)

Mesrobian claims in opposition to Sunrise's motion that this oil "was just another part of the joint venture." (Doc. 115-1 at 5.)  As explained above, Mesrobian and The Mill have not cited evidence that could support their joint venture claims at trial.  Mesrobian also cites no evidence that could connect the two Sunrise shipments to the parties' discussions about an "advance" or to The Mill's other growers, nor evidence that the Sunrise shipments were part of a broader investment strategy.

Mesrobian also claims that The Mill and Sunrise were working together "to land a contract" with a third party, "Brightline," and "were looking for a blend to use for that purpose." (*Id.*)  Even assuming this claim is true, it would not disprove The Mill's obligation to pay for the oil that Sunrise delivered.  Sunrise's motion for summary judgment of its contract claim is granted.

Sunrise also asserts common count claims.  (Doc. 27 at 4–5.)  According to the authority Sunrise cites, however, it cannot prevail on these claims if it has a valid contract claim.  *See Etchegaray Farms, LLC v. Lehr Bros., Inc.*, 326 F. Supp. 3d 987, 994–95 (E.D. Cal. 2018).  Any additional award for the same two deliveries would also lead unjustly to duplicative remedies.  The motion for summary judgment of claims two and three is denied.

### ATTACHMENT

In the alterative to summary judgment, Pompeian requests an order permitting it to attach Mesrobian's and The Mill's assets before judgment is entered.  (Doc. 102.)  The Federal Rules authorize this Court to award prejudgment remedies, including remedies that provide for the seizing of "property to secure satisfaction of the potential judgment," if that remedy is available "under the law of the state where the court is located." Fed. R. Civ. P. 64(a).  This includes an attachment.  Fed. R. Civ. P. 64(b).

"In California, the procedures and grounds for obtaining orders for prejudgment writs of attachment are governed by California Code of Civil Procedure sections 481.010–493.060."

*Blastrac, N.A. v. Concrete Sols. & Supply*, 678 F. Supp. 2d 1001, 1004 (C.D. Cal. 2010).  An writ of attachment permits "a plaintiff with a contractual claim to money" to seize the defendant's property and to have that property "held by a levying officer for execution after judgment." *Blastrac*, 678 F. Supp. 2d at 1004 (quoting *Waffer Int'l Corp. v. Khorsandi*, 69 Cal. App. 4th 1261, 1271 (1999)).

The California Code of Civil Procedure permits a court to "issue a right to attach order" if it finds four things are true:

> (1) The claim upon which the attachment is based is one upon which an attachment may be issued.
>
> (2) The plaintiff has established the probable validity of the claim upon which the attachment is based.
>
> (3) The attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based.
>
> (4) The amount to be secured by the attachment is greater than zero.

Cal. Civ. P. Code § 484.090(a).  Other statutory provisions further limit attachment claims to those for a "fixed or readily ascertainable" sum of at least $500 that are commercial in nature and either unsecured or secured by personal property, as opposed to real property.  *See id.* § 483.010; *Pet Food Exp. Ltd. v. Royal Canin USA Inc.*, No. 09-01483, 2009 WL 2252108, at *4 (N.D. Cal. July 28, 2009) (citing *Goldstein v. Barak Constr.*, 164 Cal. App. 4th 845, 852 (2008)).  The burden is on the applicant to establish each of these elements by a preponderance of the evidence. *Blastrac*, 678 F. Supp. 2d at 1004–05 (citing *Loeb & Loeb v. Beverly Glen Music, Inc.*, 166 Cal. App. 3d 1110, 1116 (1985)).

Pompeian's filings readily satisfy most of these requirements.  A court may issue an attachment in an action based on an express or implied contract, like this one.  Cal. Civ. P. Code § 483.101(a).  Pompeian seeks an attachment as part of its effort to recover the $1 million payment it made in connection with the anticipated olive oil purchase from The Mill in November and December 2022, i.e., a commercial and unsecured obligation for a fixed sum greater than $500.

The second requirement, "probable validity," is less certain.  "A claim has 'probable

23

validity' where it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." Cal. Civ. Proc. Code § 481.19. "[I]t is not enough for the plaintiff to make out a prima facie case for breach of contract; rather, the plaintiff must also show that the defenses raised are 'less than fifty percent likely to succeed.'" *Blastrac*, 678 F. Supp. 2d at 1005 (quoting *Pet Food Express, Ltd. v. Royal Canin USA Inc.*, 2009 WL 2252108, at *5 (N.D. Cal. 2009)).

As explained in the separate sections above, Mesrobian and The Mill have not cited evidence that could permit them to prove at trial that the $1 million payment was part of a joint venture. The Court has therefore granted summary judgment on those claims to Pompeian. By logical necessity then, Mesrobian's and The Mill's arguments about a joint venture cannot show Pompeian is unlikely to succeed on its contract claims in connection with its attachment motion. Although Pompeian has not demonstrated for its part that it is entitled to summary judgment on its contract or implied contract claims, the Court's task in response to a summary judgment motion is different from the task it must undertake in response to a motion for a writ of attachment. A party is entitled to summary judgment under Rule 56 only if it shows there is *no* genuine dispute as to any material fact and that it is entitled to judgment—final judgment—as a matter of law. *See* Fed. R. Civ. P. 56(a). The opposing party is entitled to favorable inferences and assumptions. *Matsushita*, 475 U.S. at 587–88. In a motion for a writ of attachment, by contrast, the moving party need only demonstrate that it is more likely to win than lose. *Blastrac*, 678 F. Supp. 2d at 1005. The court must make a finding; it must decide, even if the evidence is disputed. *See* Cal. Civ. Proc. Code §§ 484.090(a)(2), 481.190.

Pompeian has cleared this lower bar. The parties agree that the invoice "contained the following terms: The Mill would provide 48,000 gallons of the Product [organic extra virgin olive oil] to Pompeian; in exchange Pompeian would pay $1,992,000, including a $1 million prepayment, to The Mill." (Doc. 108-2 at 2.) The parties agree that "The Mill received the $1 million prepayment in early December 2022." (*Id.*) And they agree that "The Mill never returned the $1 million prepayment" and never sent 48,000 gallons of organic extra virgin olive oil to Pompeian. (*Id.* at 2–3.) Although the invoice, purchase agreement, and terms and

conditions page is ambiguous, and although the parties' conduct—viewed in the light most favorable to The Mill—could show Pompeian did not fulfill its own obligations, that is not the more likely outcome.  Even after the parties' negotiations broke down and their relationship soured, Mesrobian and The Mill took actions and made statements that clearly imply both (1) that they viewed the $1 million prepayment as an unpaid debt or a liability and (2) that Pompeian should be made whole.  (*See, e.g.*, Docs. 108-4 at 79; 108-5 at 8.)  This conduct tends to show that Pompeian had a right to a repayment of its $1 million prepayment under the agreement they made.  This conduct weighs in favor of resolving ambiguities described above in Pompeian's favor.

Pompeian has not demonstrated, however, that Mesrobian is likely to be personally liable for The Mill's obligations under a theory of alter-ego liability.  As summarized in the separate section above, The Mill appears to have been a very small business run mostly by just one man and to have had very few liquid assets, but a separate entity from Mesrobian nonetheless. Pompeian has by no means demonstrated that it is likely to prevail at trial in proving that Mesrobian used The Mill "to perpetuate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose." *Sonora Diamond*, 83 Cal. App. 4th at 538.  On this record, it appears most likely that Mesrobian always intended for The Mill to satisfy its obligations and to send the agreed volume of organic extra virgin olive oil to Pompeian but failed.

"Before issuance of a writ of attachment . . . the plaintiff shall file an undertaking to pay the defendant any amount the defendant may recover for any wrongful attachment by the plaintiff in the action."  Cal. Civ. P. Code § 489.210.  The amount of this "undertaking" is $10,000 unless the opposing party objects and "the court determines that the probable recovery for wrongful attachment exceeds the amount of the undertaking."  Cal. Civ. P. Code § 489.220(a), (b).  In that case, the court must increase the undertaking to "the amount it determines to be the probable recovery for wrongful attachment if it is ultimately determined that the attachment was wrongful."  Cal. Civ. P. Code § 220(b).  The Mill contends without argument that an attachment "could spell the end of the company" and that the cost "will be substantial."  (Doc. 104.)  Mesrobian states similarly, without elaboration or support, that any attachment "would be

25

potentially fatal to the continued survival of the company." (Doc. 104-1 at 7.)  The Court cannot find on this record that the cost of a wrongful attachment is greater than $10,000.

## CONCLUSION

For these reasons, the Court **ORDERS** as follows:

(1)     Pompeian's motion for a right to attach (Doc. 102) is **GRANTED IN PART**. Pompeian, Inc. has a right to attach property of The Mill at Kings River, LLC in the amount of $1,000,000.00.  Pompeian will file an undertaking in the amount of $10,000.  The Clerk's Office is directed to issue a writ of attachment in the amount of $1,000,000.00 for all of the property of The Mill at Kings River, LLC, which is subject to attachment pursuant to California Code of Civil Procedure § 487.010. The motion is otherwise **DENIED**.

(2)     The motion for summary judgment by Pompeian and Sunset (Doc. 108) is **GRANTED IN PART** as to the counterclaims against them by Mesrobian and The Mill.  The motion is otherwise **DENIED**; Pompeian's claims against Mesrobian and The Mill remain pending.

(3)     The motion for summary judgment by Sunrise, Dan Devico, and Michael Devico (Doc. 107) is **GRANTED IN PART** as to (1) the third-party claims against them by The Mill and Mesrobian and (2) Sunrise's third-party claim against The Mill for breach of contract.  The motion is otherwise **DENIED**.

(4)     The pretrial conference, set on June 1, 2026 is **CONTINUED** to June 12, 2026 at 8:30 a.m. via Zoom. The joint pretrial statement **SHALL** be filed no later than May 26, 2026.

IT IS SO ORDERED.

Dated:   **May 4, 2026**

UNITED STATES DISTRICT JUDGE